IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| NORTHSTAR FUNDING GROUP INC.,<br><br>                **Plaintiff,**<br><br>vs.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION and DOUGLAS M. DURBANO,<br><br>                **Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:09CV79DAK |

This matter is before the court on several motions: (1) Plaintiff Northstar's Motion for Partial Summary Judgment for Miscalculated Interest and Late Fees; (2) Defendants' Cross Motion for Partial Summary Judgment for Miscalculated Interest and Late Fees;[1] (3) Defendant Douglas M. Durbano's Motion for Summary Judgment; (4) Northstar's Cross Motion for Summary Judgment; and (5) Northstar's Motion to Amend Complaint. The court held a hearing on these motions on May 26, 2010. At the hearing, Plaintiff was represented by Matthew Boley, Defendant FDIC was represented by Rick Armstrong and Jared Asbury, and Defendant Douglas

---

[1] This case originated in Utah state court and was removed to federal court after the FDIC was appointed as the receiver for Defendant America West Bank ("AWB"). Northstar's Motion for Partial Summary Judgment for Miscalculated Interest and Late Fees and Defendants AWB and Douglas M. Durbano's Cross-Motion for Partial Summary Judgment on the same issue were originally filed in state court. At the time, AWB and Durbano were represented by the same counsel. After the FDIC was appointed, the FDIC and Durbano retained separate representation, and the FDIC removed the case to federal court. The FDIC and Durbano filed separate reply memoranda in support of the cross motion.

Durbano was represented by George Pratt and Jessica Wilde. The court heard arguments and took the motions under advisement. After carefully considering the memoranda and other materials submitted by the parties as well as the law and facts relevant to the pending motions, the court issues the following Memorandum Decision and Order.

**BACKGROUND**

This matter arises from a trustee's sale of real property in Eden, Utah (the "Property"). On October 31, 2006, America West Bank, LC ("AWB") loaned approximately $1,840,358.00 to Kings Cross Development LLC, with a first deed of trust against the Property securing a construction loan. Subsequently, on January 25, 2007, Northstar Funding Group, Inc., loaned $270,000.00 to Kings Cross, with a second deed of trust against the property securing the loan. Additionally, Weber County required Kings Cross to deposit a $157,397.96 performance bond. The parties appear to dispute whether Kings Cross fulfilled this obligation to Weber County by obtaining an escrow certificate from AWB on March 7, 2007.

Kings Cross then failed to make payments on the AWB loan, failed to pay the property taxes, and allowed mechanic's liens to be recorded against the Property.[2] Douglas M. Durbano, in his capacity as trustee under the AWB trust deed, initiated a trust deed foreclosure on the Property. On June 3, 2008, Durbano conducted a trustee's sale of the Property. At the sale, Durbano sold the Property in fifteen separate parcels. On behalf of AWB, Durbano successfully bid $2,320,000 for fourteen of the parcels, and sold the fifteenth parcel to a third party for

---

[2] Kings Cross's subcontractor Staker Parsons filed a lawsuit to foreclose mechanic's liens recorded against the Property and was allowed to intervene in this action by the state court. The FDIC, however, has subsequently paid Staker Parsons and the FDIC states that Staker Parsons is no longer a part of this action.

$10,000. Durbano collected the $10,000 from the third party at the sale. The total bid by AWB and paid by the third party at the sale, therefore, was $2,330,000.

On September 3, 2008, AWB filed the instant lawsuit against Kings Cross and related individuals for breach of contract and other claims. Also, on October 6, 2008, Northstar filed suit against AWB and Durbano alleging, among other things, a right to excess proceeds from the Property's trustee's sale. On January 13, 2009, the Utah state court, in which the actions were both filed, consolidated the actions. On March 27, 2009, the state court issued a stipulated order dismissing all claims between AWB, Durbano, and Kings Cross.

On May 1, 2009, the Utah Commissioner of Financial Institutions took over AWB and appointed the FDIC as AWB's receiver. The FDIC accepted the appointment. On May 21, 2009, the parties held a conference with the state court judge regarding the FDIC's appointment. The state court granted a 90-day stay of the proceedings and denied two motions for partial summary judgment that had been pending before it. The FDIC then removed the lawsuit to federal court.

On August 5, 2009, pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Northstar filed its proof of claim with the FDIC. The FDIC had 180 days from that date--or until February 1, 2010--to consider Northstar's claims. This court granted a further stay of the proceedings pending the conclusion of the 180-day administrative review of Northstar's claim.

During the administrative review of Northstar's claim, the FDIC allowed Northstar's claim for excess proceeds in the amount of $33,261.14, waived the five percent late fee, and issued a Receivership Certificate to Northstar in that amount. Because the FDIC did not grant Northstar's claim for the full amount it requested, Northstar is pursuing the action for the balance

of its claim.

## DISCUSSION

### Cross Motions for Partial Summary Judgment on Interest and Late Fees

The parties' competing cross-motions for partial summary judgment regarding interest and late fees present three main issues: (1) whether there were excess sale proceeds from the trustee's sale because of an alleged miscalculation of default interest; (2) whether the late fees charged by AWB constitute an unenforceable penalty; and (3) whether a late fee could be charged on monies certified on the Weber County bond obligation.

**A. Calculation of Default Interest**

Northstar argues that it is entitled to an award of excess sale proceeds because AWB overstated the amount of default interest by at least $62,082.17. Northstar premises its arguments on the fact that Kings Cross made a $14,000 payment on November 21, 2007, and AWB credited $13,909.78 to interest and $90.22 to principal. Northstar, therefore, contends that AWB's application of some amount of the payment to principal is an acknowledgment that all interest due and owing as of that date was satisfied. And, if no interest was due an owing as of November 21, 2007, Northstar claims that AWB overstated the interest.

Defendants, however, argue that the application of money to principal was done in error by one of AWB's employees. Defendants contend that it is undisputed based on the payment records that Kings Cross was in default on November 21, 2007, and the outstanding interest balance was $48,592.35. The payment records demonstrate that Kings Cross had not made payments since September 1, 2007, and the note was an interest-only obligation that was due in full on November 1, 2007. Thus, on November 21, 2007, interest from September and October

at the rate of 9.75% was due, and for November 1 through 20, 2007 interest was due at the default rate of twenty-one percent. Because the interest rate was set in the loan documents and the payment history is clear, Defendants contend that they are entitled to summary judgment as a matter of law on the calculation of interest issue.

The court agrees with Defendants that based on the payment history records it is mathematically impossible that $13,909.78 was enough to pay off all the interest that had accrued on the loan as of November 21, 2007. The twenty-one percent default interest rate is undisputed and Northstar does not dispute that prior to the application of $90.22 to principal on November 21, 2007, the principal amount of the Loan was $1,722,735.22. The Loan, therefore, accrued $20,098.60 of default interest from November 1, 2007, to November 20, 2007.

The application of $90.22 to principal does not demonstrate that the interest had been paid off as of November 21, 2007, but rather that there was a data entry error made by AWB. Such an error does not create a disputed issue of fact or change the actual payment history and applicable interest rates in the loan documents. The court concludes that Defendants are entitled to a summary declaration that there was $48,592.35 of interest owing on the loan (exclusive of any interest that may be owing on the Weber County Bond) as of November 21, 2007, when the $14,000 payment was made. This amount includes $28,493.75 in non-default interest for September 2007 and October 2007 and $20,098 in default interest that accumulated from November 1, 2007 to November 20, 2007.

Defendants argue that the court can further determine the amount of interest that was due on the date of the trustee sale, June 3, 2007. Defendants' position is that the total interest due on June 3, 2007, was $255,483.37. Defendants break down that total to include $23,924.74 for

Weber County bond interest, $48,592.32 for interest from September 1 through November 20, 2007, plus $196,966.28 in default interest from November 21, 2007 until June 3, 2008, minus the $14,000 payment made by Kings Cross on November 21, 2007.

Northstar argues that Defendants are not entitled to a summary declaration that the interest owing on the loan as of the date of the foreclosure sale was $255,487.37. Northstar first takes issue with the fact that Defendants' stated interest due has changed from the date of the trustee sale to now. Northstar claims that Defendants are not entitled to amend AWB's interest calculations, post-trustee sale. Defendant's witness, Ms. Townsend, originally testified that the interest was $258,033.77, but submitted a new affidavit stating that the interest was $255,487.37.

Northstar, however, cites to no authority that would require Defendants to rely on AWB's previous calculation even if they discovered they were mistaken or that the calculation was not supported by the facts. Moreover, Northstar does not demonstrate how the roughly $2500 change in the stated interest due affects its position or prejudices it. The purpose of the discovery process is to uncover the facts relevant to the legal claims. If that process results in a party being able to more accurately reflect the facts, they should not be required to proceed with a mistaken calculation. Thus, in the absence of some legal authority to the contrary, the court finds no basis for Northstar's position that Defendants should be tied to its previous calculation.

Next, Northstar asserts that the court cannot determine the interest due as of the date of the trustee's sale because the parties dispute whether interest was due on a performance bond obligation to Weber County. The FDIC argues that it is entitled to a summary declaration that there was $23,924.74 of interest that accumulated as a result of the escrow account set up for the Weber County bond. Northstar, however, argues that there was no escrow set up for the bond

obligation and, in any event, AWB agreed to waive any interest on the amount.

Defendants assert that on March 7, 2007, AWB committed $157,397.96 to be paid on Kings Cross' behalf to Weber County to guarantee Kings Cross' installation and completion of the improvements on the Property. Defendants contend that this commitment constitutes an advance under the terms of the loan documents and that from March 7, 2007, interest began accumulating on the committed funds. Under the Construction Loan Agreement, it states that "[t]he loan shall bear interest on each Advance from the date of the Advance in accordance with the terms of the Note." The Agreement defines an "advance" as "a distribution of loan funds made or to be made to borrower or on borrower's behalf." Accordingly, Defendants seek a declaration that they are entitled to interest on those funds.

Northstar, however, argues that the funds cannot be considered an advance under the terms of the loan document because money was not officially escrowed or, at least, there is a disputed issue of fact as to whether the funds were escrowed. Defendants admit that as a courtesy to Kings Cross--so that it would not have to pay interest on the escrow obligation before the loan was due in full--AWB had not transferred the funds into an escrow account by November 1, 2007. Northstar asserts that, in fact, AWB did not transfer funds into escrow until June 27, 2008, approximately three weeks after the June 3, 2008 trustee's sale. Because the money was not put in escrow, Northstar claims there is no basis for claiming that the money was actually committed on behalf of Kings' Cross.

At this stage of the litigation, the court cannot declare as a matter of law whether the funds were an advance under the loan documents. The parties dispute whether the money was actually committed and there is insufficient evidence before the court as to whether the money

was in fact committed on behalf of Kings Cross. In addition, there is a factual dispute as to whether AWB's statement to Kings Cross that it need not pay interest on the funds until November 1, 2010 constitutes a waiver of the right to charge interest on the funds prior to that date. Accordingly, the court cannot enter summary judgment as a matter of law with respect to the amount of interest that may have been due and owing on funds in connection with the Weber County bond obligation.

**B. Late Fee Issue**

Northstar argues that AWB's late fee of five percent of the principal and interest balance is excessive in light of AWB's twenty-one percent default interest. Northstar claims that such an excessive rate of interest constitutes an unenforceable penalty as a matter of law. Defendants argue that percentage late fees are commonly charged by banks and a five percent late fee does not constitute an unenforceable penalty under Utah law.

The Loan included a five percent late fee on any regularly scheduled payment not made. In this case, the entire principal amount, together with all accumulated and unpaid interest was scheduled to be made November 1, 2007, but was not. Accordingly, the Bank charged a five percent late fee on the entire amount of that payment. The late fee amounted to $92,070.62.

Northstar relies on Utah case law espousing a policy against the imposition of liquidated damages that constitute a penalty. *See Woodhaven Apts. v. Washington*, 942 P.2d 918, 920 (Utah 1997). In order for liquidated damages to be enforceable they must be a reasonable forecast of just compensation for the harm that is caused by the breach. Whether liquidated damages are a reasonable forecast of actual damages is an issue of fact. *Id.* at 924.

Northstar's approach assumes that AWB bears the burden of proving the validity of its

late fee. Courts from other jurisdictions addressing this issue, however, have held that the party challenging the clause bears the burden of proving its unreasonableness. *Metlife Capital Fin. Corp. v. Washington Ave Assocs. L.P.*, 732 A.2d 493, 499 (N.J. 1999) (late fees "are presumptively reasonable and the party challenging the clause bears the burden of proving its unreasonableness."). The Utah Supreme Court has similarly placed the burden of proof on a party seeking to invalidate a liquidated damages provision. *Young Electric Sign Co. v. United Standard West, Inc.*, 755 P.2d 162, 164 (Utah 1988).

In this case, the evidence shows that while AWB's Loan provided for a five percent late fee, Northstar's loan documents on the Property provided for a ten percent late fee. Both Northstar's late fee and default interest rate are much higher that AWB's. Nonetheless, Northstar makes several arguments directed at the reasonableness of Durbano's testimony regarding the reasons for charging a late fee, but it offers no evidence of its own demonstrating why the fee is unreasonable. Northstar has presented no credible evidence to rebut the assertion that the fees assist in covering costs that may be incurred in connection with foreclosure or resale as well as post-foreclosure costs. Moreover, Northstar's self-serving arguments are belied by its own rates. There is no evidence before the court that the five percent late fee is a penalty rather than a reasonable forecast of just compensation. The court, therefore, concludes it is appropriate to grant summary judgment declaring that AWB's late fee is valid and enforceable.

## C. Late Fee Charged on Weber County Bond

Northstar argues that AWB's application of a five percent late fee on the funds committed for the Weber County bond was inappropriate because the money certified to the county was a contingent liability that AWB had not actually paid. Northstar contends that AWB's loan

9

documents only allow AWB to charge a late fee on a regularly scheduled payment and the Weber County bond liability was not a regularly scheduled payment. Moreover, Northstar claims that AWB never paid the bond amount to Weber County, but only guaranteed that certain improvements would be constructed.

Defendants, however, argue that AWB is entitled to the late fee on the full principal amount owed to it on November 1, 2007, which includes the sum of all advances. Defendants argue that the Weber County bond liability is an "advance" as that term is defined under the applicable loan documents. An advance is defined in Kings Cross's agreement with AWB as "a disbursement of loan funds made or to be made to borrower or on borrower's behalf." Northstar argues that the committed funds could not be an advance because they were not disbursed.

However, the plain language of the agreement states that an advance is a disbursement "made or to be made." The escrow funds were committed by AWB for Kings Cross's benefit and constituted a disbursement to be made. Accordingly, Kings Cross was obligated under the note to pay AWB on November 1, 2007, for the amount AWB committed to Weber County. When that amount was not paid on November 1, 2007, the $118,677.26 was subject to the five percent late fee.

Northstar argues that AWB admits that "[a]s a courtesy to Kings Cross so that it would not have to pay interest on the escrow obligation before the loan was due in full, the Bank had not transferred the funds into an escrow account by November 1, 2007." Based on this agreement, Northstar asserts that AWB intentionally did not escrow or advance the funds before November 1, 2007. This agreement, however, states that there is an escrow obligation. The agreement merely is to forego the payment of interest on the obligation prior to November 1,

2007, when payment of the sum was due. The agreement, therefore, actually supports Defendants' position that the amount of the escrow obligation was part of the outstanding principal due on November 1, 2007. Accordingly, the amount was subject to the five percent late fee when it was not paid on that date.

## Durbano's Motion for Summary Judgment

Northstar's claims against Durbano focus on whether he breached his duties as a trustee when he conducted the trustee's sale, did a credit bid of $2,330,000 on behalf of AWB, and did not pay over any excess proceeds to junior lienholders. The main dispute between the parties involves the correct calculation of the debt owed to AWB. Northstar claims that the debt was only $2,000,000, whereas AWB and Durbano claim that the secured debt exceeded the credit bid amount of $2,330,000. Northstar points out that, unlike some trustees, Durbano, as President and CEO of AWB, was in a position to know whether AWB's credit bid was correct.

Despite the parties' dispute as to the correct calculation of the indebtedness, Durbano argues that he is entitled to summary judgment for the following three reasons: (1) in his role as trustee under AWB's deed of trust, he was acting as AWB's agent and cannot be held liable for carrying out instructions given to him by his principal, AWB; (2) other than the one lot sold for $10,000 to another party, there were no excess proceeds generated from the trustee's sale which Durbano would be required to turn over to Northstar; and (3) Northstar cannot prove that it suffered any damages as a result of the allegedly excessive credit bids.

**1) Durbano's Role As Trustee**

Northstar asserts that it has adduced evidence demonstrating that Durbano did not innocently follow AWB's instructions but actively participated in formulating AWB's allegedly

11

overstated bids. Durbano, however, states that regardless of the dispute as to the bid amount, Northstar cannot state a claim against Durbano in his role as trustee and there are no claims against Durbano in his role as an officer of AWB.

A legal dispute exists as to whether Durbano as trustee is liable for actions he took in his capacity as an officer of the beneficiary, AWB. Northstar appears to assume that it can hold Durbano liable as the trustee for actions which AWB took in its capacity as beneficiary under the trust deed because of Durbano's dual role. This position, however, is unfounded inasmuch as the trustee's duty can only relate to the trustee's functions and capacities, not to the functions and capacities of the beneficiary and its officers. Northstar, in effect, would have the court hold the trustee liable for the decisions of the beneficiary's officers and ignore the party's roles. Northstar's Complaint does not state a cause of action against Durbano in his capacity as an officer of AWB. Any such claims are not before the court. Statutory liabilities must arise out of statutory responsibilities.

When Durbano became the successor trustee, he became obligated to exercise the power of sale in accordance with Utah's trust deed statute and the beneficiary's instructions. A trustee under a deed of trust is merely an agent for his principal, the beneficiary under the deed of trust. "The trustee in [a] nonjudicial foreclosure is not a true trustee with fiduciary duties, but rather a common agent for the trustor and beneficiary." *Pro Value Properties Inc v. Quality Loan Service Corp.*, 88 Cal. Rptr. 3d 381, 384 (Cal. Ct. App. 2009); *Russell v. Lundberg*, 2005 UT App 315, ¶ 22, 120 P.2d 541 (stating that a trustee's primary duty and obligation is to the beneficiary of the trust). Just like any agent, a trustee is "authorized by another to 'act on his behalf and subject to his control.'" *Ivie v. Hickman*, 2004 UT App. 469, ¶ 11, 105 P.3d 946.

Durbano argues that he, as the trustee, did not have a duty to question AWB's credit bid. But Northstar claims that Utah Code Annotated Section 57-1-28(1)(b) establishes that the trustee has a duty to ensure that a beneficiary's credit bid includes only amounts actually due from the borrower and permitted by the statute. Under Section 57-1-28(b)(1), the beneficiary of a deed of trust shall receive a credit on its bid in an amount not to exceed the amount representing "(I) the unpaid principal owed; (ii) accrued interest as of the date of the sale; (iii) advances for the payment of (A) taxes; (B) insurance; and (C) maintenance and protection of the trust property; (iv) the beneficiary's lien on the trust property; and (v) costs of sale, including reasonable trustee's and attorney's fees."

This statute merely sets out the different items that can be included in the beneficiary's credit bid. Nothing in the statutes states that the Trustee has the duty to ensure that the beneficiary makes the correct calculation. The statute does not enumerate specific steps the trustee should take to ensure the accuracy of a beneficiary's credit calculation. And, the statute does not identify a penalty if the trustee fails to take steps to ensure the accuracy of the credit calculation.

Northstar states that Durbano had no duty to follow unreasonable instructions. Northstar, however, does not make any claims as to the reasonableness of the instructions which Durbano followed. Northstar questions AWB's credit calculations based on payoff statements that set forth the amount which AWB would accept to release its lien on the Property prior to the trustee's sale of the Property. These statements, however, made no representations to any party as to what AWB was actually owed or the costs AWB would incur throughout the foreclosure process that are acceptable to include in a credit bid. It remains to be determined in this case whether AWB

13

exceeded its credit. Nonetheless, the statute does not explicitly require the trustee to challenge a beneficiary's credit determination in order to arrive at the conclusion that the beneficiary failed to pay the amount bid. There is nothing in the statute that deals with the trustee's duty when a third party disputes the beneficiary's claims that its credit meets or exceeds its bid. To imply a duty requiring the trustee to assume that the beneficiary's calculation is incorrect would be inconsistent with the trustee's primary duty to the beneficiary to secure the payment of the secured debt under the deed of trust.

Moreover, where the accuracy of the beneficiary's credit bid is disputed, the court cannot make the trustee strictly liable for the accuracy of the beneficiary's bid calculation where the legislature has not clearly provided such. Such a duty would discourage eligible candidates from serving as trustee and such policy determinations should be made by the legislature.

**2) Duty to Pay Excess Proceeds**

Northstar alleges that Durbano and AWB violated Utah Code Ann. § 57-1-29 by failing to pay Northstar the alleged excess proceeds. When a beneficiary makes a credit bid at a foreclosure sale, no proceeds are generated unless the amount of the bid exceeds the amount of the indebtedness. *See American Falls Canal Securities Co. v. American Savings & Loan Ass'n*, 775 P.2d 412, 413 (Utah 1989). Northstar claims that AWB's credit bids of $2,330,000 overstates what AWB was actually owed under its note with Kings Cross by $239,183.69 to $290,076.94. It is AWB's allegedly excess credit bid that Northstar claims generated excess proceeds. The correct credit calculations, however, are factually disputed. The issue on summary judgment, therefore, is whether Durbano had a duty to pay over excess proceeds when there was a dispute as to AWB's credit bid.

14

Utah Code Annotated Section 57-1-29 describes what the trustee must do with the proceeds of a trustee's sale. Section 57-1-29 does not address what should happen if a beneficiary credit bids more than what it is actually owed. Thus there are no statutory directives for a trustee in that situation. Northstar's claims against Durbano, however, would make Durbano, as trustee, liable for the beneficiary's miscalculation of what it was owed. Such a result would make the trustee liable as a guarantor of the beneficiary's calculations. However, there is simply no statutory duty imposed on the trustee to compensate a junior lienholder when there has been an allegedly excessive credit bid.

Northstar relies on *Randall v. Valley Title*, 681 P.2d 219, 222 (Utah 1984) to assert that the trustee can be held liable for the difference between the bid amount and the true debt due to the beneficiary. In *Randall*, however, there was no dispute that the foreclosing beneficiary had bid more than the sum of the costs of sale and the canceled debt. *Id.* at 221. The issue was who was entitled to receive the surplus from the sale. *Id.* Similarly, in *Timm v. Dewsnup*, relied on by Northstar, there was no dispute that there was a surplus from the sale, the only question was to whom the surplus should be distributed. 2003 UT 47, 86 P3d 699. Cases in which there was no dispute as to whether a surplus existed are factually distinguishable from the present case.

In this case, Durbano never demanded payment and AWB never failed to pay its bid because they both factually believe that AWB's credit exceeded its bid. Northstar does not state what a trustee's duties are when leinholders disagree on the amount of the credit bid. Northstar merely states that Durbano violated his statutory duties as trustee on these disputed grounds. However, Northstar's statutory reference merely states that if the highest bidder fails to pay the amount bid, the trustee shall renotice the sale or sell the property to the next highest bidder. The

statutory reference, therefore, does not address the trustees duties when there is a dispute as to credit calculations. The court, therefore, concludes that there is no basis under Utah's trust deed statute for holding Durbano, as the trustee, liable to a junior lienholder when that lienholder disputes a senior lienholder's credit calculation.

### 3) Northstar's Alleged Damages

Finally, Durbano argues that he is entitled to summary judgment because Northstar cannot prove any damages. Even if AWB had credit bid the amount Northstar claims is correct, $2,039,923.06, AWB would still have been the highest bidder on each of the 14 lots. Thus, whether AWB had credit bid the amount Northstar thought was the correct amount, no cash proceeds would have been received from the sale. The court, therefore, agrees that Northstar cannot establish that it has suffered any damages as a result of AWB's allegedly excessive credit bids.

Accordingly, the court concludes that Durbano is entitled to summary judgment because there is no basis for finding him liable to Northstar in his role as trustee. Moreover, Northstar has not demonstrated that it can establish damages. Therefore, the court grants Durbano's Motion for Summary Judgment and denies Northstar's cross-motion for summary judgment.

## Northstar's Motion for Leave to Amend Complaint

Northstar seeks leave to amend its Complaint against the FDIC and Durbano to plead alternative remedies or theories of recovery based on the same facts and circumstances alleged in the original Complaint. Northstar's original Complaint sought only money damages. Northstar now seeks to add the following remedies or theories of recovery: (1) rescission; (2) declaratory judgment voiding the trustee's sale in part; (3) equitable lien and decree of foreclosure; (4)

constructive trust; (5) declaratory judgment survival of Northstar's lien; (6) equitable subordination; (7) fraudulent transfer; (8) breach of trustee's duty; and (9) conversion.

Northstar argues that changed circumstances support the amendment because AWB is in liquidation and the FDIC has been appointed as receiver for AWB. Although Northstar participated in good faith with the FDIC's administrative claims process, Northstar does not expect that it will receive any more cash payments on its claims. Northstar, therefore, believes a money judgment against the FDIC, as receiver, likely would be futile. As such, Northstar asserts that amendment is necessary to permit it any possibility of a meaningful recovery on account of its claim. Northstar believes that is should be permitted to seek recovery from the Property purportedly sold at the trustee's sale.

Defendants, however, oppose Northstar's motion for leave to amend its sought after remedies because they claim that it dramatically shifts the focus of this case. Northstar now claims that due to the alleged credit miscalculation, the trustee sale should be voided and the court should declare that Northstar's lien was not extinguished by the sale. Defendants claims this is just an attempt to get around the fact that there are no "excess" proceeds.

Although Northstar is now hoping to seek alternative remedies, Northstar's protection was to bid at the trustee's sale. Northstar failed to take advantage of that remedy, filed suit to get excess proceeds that did not exist, and now seeks to get alternative remedies that were not sought during the FIRREA administrative process.

The FDIC asserts that amendment should be denied because it is futile. This court only has jurisdiction to hear claims after the FDIC has disallowed the claims in the administrative process. Northstar did not raise these new alternative remedies in the administrative process.

*See* 12 U.S.C. § 1821(d)(6)(A)(ii). Furthermore, Northstar's alternative remedies are unnecessary. Northstar claims it will be stripped of the protections it had in the foreclosure sale if it is not allowed to amend. But the FDIC has discharged the bid to the extent of the claim and the claim was sufficient to cover the entire bid amount. Northstar's original third cause of action for failure to pay bid price protects Northstar even if the facts are as they claim. This claim has already been submitted to the FDIC. Alternative remedies for the same protection are unnecessary.

Moreover, with respect to Durbano, the request to amend is untimely. The FDIC's appointment does not justify additional claims against Durbano. Unlike the FDIC, there are no new circumstances relating to Durbano that would justify new claims against him. Durbano filed a motion for summary judgment in November, 2009. Later that month, Northstar sought amendment seeking additional common law claims in addition to the original statutory claims. Northstar's motion to add new claims appears to be an attempt to oppose summary judgment. Even if the change in circumstances with the FDIC may justify a late amendment with respect to claims involving AWB, it could not justify such a late amendment as to Durbano. Therefore, the court concludes that undue delay justifies the denial of Northstar's motion to amend, which was filed well into the summary judgment phase of the litigation.

Accordingly, Northstar's Motion for Leave to Amend Complaint is denied.

## CONCLUSION

Based on the above reasoning, (1) Plaintiff Northstar's Motion for Partial Summary Judgment for Miscalculated Interest and Late Fees is DENIED; (2) Defendants' Cross Motion for Partial Summary Judgment for Miscalculated Interest and Late Fees is GRANTED IN PART

AND DENIED IN PART; (3) Defendant Douglas M. Durbano's Motion for Summary Judgment is GRANTED; (4) Northstar's Cross Motion for Summary Judgment is DENIED; and (5) Northstar's Motion to Amend Complaint is DENIED.

DATED this 15th day of July, 2010.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge